W. SHARP, J.,
dissenting.
I respectfully dissent. In my view, it was proper for the Department of Revenue to add the costs paid for information concerning horse lineage, race records, et at, in the “cost price” of the catalogs used to facilitate the sale of horses at the Ocala Breeders’ Auction. Thus, I would reverse.
The State of Florida imposes a tax on tangible personal property as follows:
212.05 Sales, storage, use tax.
It is hereby declared to be the legislative intent that every person is exercising a taxable privilege who engages in the business of selling tangible personal property at retail in this state, including the business of making mail order sales, or who rents or furnishes any of the things or services taxable under this chapter, or who stores for use or consumption in this state any item or article of tangible personal property as defined herein and who leases or rents such property within the state. Subsection 212.05(l)(a) imposes a sales tax: 1. a. At the rate of 6 percent of the sales price of each item or article of tangible personal property when sold at retail in this state, computed on each taxable sale for the purpose of remitting the amount of tax .due the state, and including each and every retail sale.
Subsection 212.05(l)(b) imposes a use tax:
At the rate of 6 percent of the cost price of each item or article of tangible personal property when the same is not sold but is used, consumed, distributed, or stored for use or consumption in this state.
These are comprehensive, interlocking measures.
The primary function of the use tax is to complement the sales tax so as to make uniform the taxation of property subject to the tax, whether produced, purchased and used in this state, or produced and purchased in another state or country, but used in this state. U.S. Gypsum Co. v. Green, 110 So.2d 409 (Fla.1959). The use tax is complementary to the sales tax and is designed to cover those transactions not covered by the general sales tax act. Sharper Image Corp. v. State, Department of Treasurer, 216 Mich.App. 698, 550 N.W.2d 596 (Mich.App.1996).
As the record shows in this case, Ocala Breeders’ sells horses on consignment at its auction in Marion County, Florida. In order to promote its sales, the background and pedigree of the horses going to auction must be reliably furnished to prospective buyers. Very high prices are paid based in large part, on those factors. This is not the kind of market where buyers come, examine the merchandise, “kick the tires,” and rely on their own observations in making a decision to buy and at what price.
To furnish this essential information to prospective bidders at the auction it conducts, Ocala Breeders’ contracts with research service companies to compile information for each horse accepted for auction. This information includes the horse’s lineage, race record of its ancestors, and the horse’s own race record. This information is put into the catalogs, which are distributed to prospective auction patrons and buyers prior to the auction. For this information, Ocala *390 Breeders’ pays a fee for the report on each horse. The information comes to Ocala Breeders’ via computer transmissions, or in some cases, goes directly to out-of-state printers who print the catalogs.
The catalogs are then distributed for use in Florida. Both parties agree in this case a use tax on the catalogs is proper. See U.S. Gypsum Co. v. Green, 110 So.2d 409 (Fla.1959) (use tax properly levied on advertising brochures distributed free of charge to dealers); Sharper Image Corp. v. Dept. of Revenue, State of Florida, 704 So.2d 657 (Fla. 1st DCA 1997) (retailer’s catalogs which were printed and mailed from Nebraska and delivered to residents of Florida were properly subject to use tax); Sharper Image Corp. v. Arizona Dept. of Revenue, 191 Ariz. 475, 957 P.2d 1369 (Ariz.App.1998) (retailer’s printing and shipping of merchandise catalogs to state residents was a taxable use of the catalogs in the state); Comfortably Yours, Inc. v. Director, Division of Taxation, 272 N.J.Super. 540, 640 A.2d 862 (1994) (the cost of producing and distributing direct mail order catalogs by out of state printers to customers in New Jersey is subject to New Jersey’s use tax.). The issue in this case is whether or not the cost of the information (fees) paid by Ocala Breeders’ for inclusion in the catalogs should be included in the “cost price” of the catalogs, for purposes of the use tax.
Section 212.02(4) defines “cost price” as follows:
“Cost price” means the actual cost of articles of tangible personal property without any deductions therefrom on account of the cost of materials used, labor or service cost, transportation charges, or any expenses whatsoever.
This definition is similar to “sales price” for purposes of the sales tax. Section 212.02(16) provides:
Sales price means the total amount paid for tangible personal property, including any services that are a part of the sale, valued in money, whether paid in money or otherwise, and includes any amount for which credit is given to the purchaser by the seller, without any deduction therefrom on account of the cost of the property sold, the cost of materials used, labor or service cost, interest charged, losses, or any other expense whatsoever.
In my view, Department of Revenue v. Quotron Systems, Inc., 615 So.2d 774 (Fla. 3d DCA 1993) is not controlling. Quotron provided on-line computer delivery of financial news and information to subscribers via display on video screens. The subscribers were banks, stock brokerage firms, fund managers and financial institutions. The Department claimed the transmission of electronic images to subscribers was a sale of tangible personal property for the purposes of the sales tax. The court noted that when the Florida Legislature taxed computer services in 1987 as part of its services tax, it did not tax these services as tangible or intangible property, but rather as a service.
But in this case, the item being taxed is not the transmission of electric images. Rather, it is the inclusion of that information, in hard copy form, as part of catalogs distributed to prospective auction buyers. Pursuant to section 212.02(4), “cost price” includes the cost of such services necessary to produce the catalogs. Without the information about the horses, for which Ocala Breeders’ pays the fees, the catalogs would most likely be useless — containing pretty pictures, advertising (maybe), and simply names of horses going to auction — but not the information necessary to interest the prospective buyers. The cost of fees paid for this critical information should logically be included as part of the cost price or expense of the catalogs.
Such an interpretation achieves uniformity in the taxation scheme. If Ocala Breeders’ charged a fee for the catalog, then the cost of compiling and obtaining the research information about the horses would be reflected in the sales price. And a sales tax would include that factor. Similarly, if another kind of catalog producer, such as Sears, distributed its catalogs to segments of the public targeted as prospective buyers, all of its costs to put the catalog together would be included. Part of those costs would be the in-house expenses of its employees or subcontractors to collect the necessary sales information important to prospective customers — such as price, order number, warranty, *391 description of item, and perhaps other facts designed to promote sales.
Inclusion of the fees paid for the horse information in the catalogs for purposes of calculating the use tax is supported by an out-of-state decision, Rivergate Toyota, Inc. v. Huddleston, 1998 WL 83720 (Tenn.Ct.App.1998). In that case, Rivergate purchased advertising brochures from an out-of-state vendor and mailed them to Tennessee residents. Rivergate paid over $80,000 for the design, production and mailing of the brochures. The Tennessee Commissioner of Revenue imposed a use tax on this cost of the brochures. Rivergate challenged the assessment, asserting that its tax liability should have been based on $12,022.23 — the cost of printing the brochures. Ocala Breeders’ makes a similar argument in this case.
Tennessee law provides for a use tax on the “cost price” of all tangible personal property used or distributed in the state. Like Florida, the Tennessee law defines “cost price” as the “actual cost of articles of tangible personal property without any deductions therefrom on account of the cost of materials used, labor, or service costs, transportation charges or any expenses whatsoever.” However, the Tennessee law also has a separate provision imposing the use tax on the “value” of the catalogs, advertising fliers or other advertising publications. Rivergate argued the brochures’ value is not the same as their cost price and that its tax liability should be based only on the final printed cost of the brochures without considering the cost of labor, services, or other expenses incurred to produce and distribute the brochures.
The Tennessee court rejected this argument. It held the term “value” has the same meaning as “cost price” and therefore, value must include the cost to design and distribute the brochures. The court recognized that an item may derive the greater part of its value from the services performed on it or included within it:
Thus, the Tennessee Supreme Court has rejected arguments that only the cost of the raw materials should be taxed when the finished item is the essential part of the transaction. See Thomas Nelson, Inc. v. Olsen, 723 S.W.2d at 622 (declining to separate the cost of the materials from costs to design and produce these models); Crescent Amusement Co. v. Carson, 187 Tenn. 112, 116-17, 213 S.W.2d 27, 29 (1948) (declining to recognize a distinction between a motion picture and the film it was on).
In this case Rivergate Toyota contracted with Sales Tools Unlimited for the design, production and distribution of direct mail brochures. These brochures were not inconsequential elements of the transaction but, in fact were the sole purpose of the contract. The value to Rivergate Toyota was not just in the brochures themselves but in the completed brochures in the hands of potential customers. Since Riv-ergate Toyota contracted for mailing completed advertising brochures to potential customers, the trial court correctly concluded that it was liable for the ‘entire cost of the transaction’ with Sales Tools Unlimited during the audit period.
1998 WL 83720 at p. 3.
In this ease, the bulk of the value of the catalogs was derived from the information concerning the horses that Ocala Breeders’ paid to out-of-state providers (the Jockey Club and Blood Stock Research) to obtain, and reproduce for its sales prospects. Without this information, the catalogs would not have promoted sales at the auctions conducted by Ocala Breeders’. As in the Rivergate case, the primary value of the catalogs can be viewed as a “service.” However, this categorization should not exclude that added value to the catalogs from taxation under both states’ use tax. Clearly it is a necessary cost of both the brochures in Tennessee and the catalogs in Florida. Further, the Florida use tax expressly includes “labor or service costs.”